Good morning, your honors. My name is Jonathan Jackson. I'm with Latham & Watkins. I'm counsel for petitioners Karin Martoyan and his family. What I'd like to do with the time that I have today is first, address the case of Mag v. Holder that the panel instructed the parties to be able to discuss today. And then second, with respect to the underlying adverse credibility determination in this case, I'd like to reserve the remainder of my time for rebuttal. The reason for that is, with respect to the adverse credibility finding, I think the briefing in this case, at least in some respects, was like two ships passing in the night. In the government's brief, they recited the immigration judge's decision and argued that the IJ made rational determinations and came to reasonable conclusions. Petitioners respectfully submit that these are necessary but not sufficient conditions for this court to affirm the adverse credibility finding. And as discussed in the petitioner's brief, in addition to the other flaws in the immigration judge's reasoning, the government has failed to identify a single inconsistency for which the immigration judge satisfied this court's requirements. Specifically, one, that the immigration judge identify specific inconsistencies and not mere omissions in the petitioner's testimony to go to the heart of the claim for asylum. Two, provide the petitioner with a reasonable opportunity to explain any perceived inconsistencies. And three, address any plausible explanations provided by the petitioner in a reasoned manner. I wonder, would you address the timeliness to begin with? Because if it's not timely, you don't have a case. And you treat it as kind of an afterthought in the brief, and it seemed the weaker part of your case. Was it timely? Is there a reason to excuse it? Yes, Your Honor. With respect to the case Temang v. Holder, they addressed that very issue. And as applicable here, in Temang, the court addressed the question of whether this court had jurisdiction to review the B.I.'s determination that petitioner's asylum application was untimely. And more specifically, whether it had jurisdiction to determine whether the petitioner qualified for the extraordinary circumstances exception to the one-year bar based on ineffective assistance of counsel. Under the Real ID Act, this court has jurisdiction in two circumstances. One, if that raises a constitutional question. And two, if it raises a question of law, including a so-called mixed question of fact and law in which undisputed facts are applied to a legal standard. So the specific question addressed by the court in Temang was, what facts must be undisputed in order for this court to exercise jurisdiction over the timeliness question? And in answering that question, the Temang court referred specifically to the Lozada requirements. The so-called Lozada requirements named for the original B.I.A. case in which they were established. And under those requirements, in order to raise an ineffective assistance of counsel claim, petitioners typically need to do three things. One, provide an affidavit detailing the agreement with counsel. Two, inform counsel of the allegations and provide counsel with the opportunity to respond. And three, file a complaint with a state bar or other applicable governmental authorities. And so long as those facts are undisputed, the Temang court held that this court has jurisdiction over the question. The Temang court went on to hold, in that case, quote, Temang does not dispute that he failed to satisfy these factual elements. Rather, Temang argues he should not be required to satisfy these elements. As such, the relevant facts are undisputed, and pursuant to Ninth Circuit authority, Temang's claim is a mixed question of law and fact. Accordingly, we find we have jurisdiction. And with respect to jurisdiction, Your Honor, this case is on all fours with Temang. In this case, petitioners do not contain they strictly complied with the Lozada requirements. Instead, they argue that they were accepted from doing so under Ninth Circuit precedent, because in this case, the ineffective assistance of counsel is plain on the face of the record. So I have two questions. I mean, first of all, that ultimately underlying the I.J.'s timeliness determination was that he didn't believe his story. I mean, quite aside from the Lozada problem, he didn't believe his story, that he had actually given this to Achat in August and who mailed it in March. And why isn't that a factual question? That is a very good question, Your Honor. I would address that on two points. Interestingly enough, with respect to that very question, I think the Temang court went even further with respect to jurisdiction than the panel needs to do in this case to find jurisdiction. In Temang, the panel actually affirmed the I.J.'s adverse credibility determination. And nevertheless, found that the relevant factual questions, which was a narrow set of factual questions, just the Lozada requirements, because those were undisputed and nevertheless exercised jurisdiction over the claim. I don't understand how he could do that here, because if he was not credible and he didn't, in fact, send this in, sign it in August and give it to Achat, then the Lozada stuff doesn't matter at all. You're absolutely correct. Petitioner's argument in this case is essentially that the adverse credibility finding is insufficient, and therefore, this point of view. But you're assuming it's a unitary adverse credibility finding. You're assuming that he couldn't have said that he – that because he didn't believe his story about what happened to him in Armenia, is why he didn't believe what happened with Achat. That's not – I don't know that the I.J. was compelled to believe one – both or neither. And I don't know – it seems to me the reason he came from not believing the Achat story was, you know, you didn't bring in the friend. You didn't name the friend. You didn't provide any reason to believe that Achat ever existed. You know, there's no phone number. There's no – there's no nothing. Yes, Your Honor, and I'm applying, in large part, the Kumar v. Gonzalez case that I cited in the briefs, which I understand was unpublished and is only persuasive authority, which, again, is factually very similar to the case here. There was an adverse credibility finding, which was overturned by this Court, and the Court in that case said once the adverse credibility determination is overturned, this Court must accept as credible Petitioner's testimony, and it didn't differentiate between testimony at one part of the hearing versus another part of the hearing. And given that they must accept as true, that testimony here, given that testimony, clearly Achat performed an effective assistance to counsel, and he qualifies for the extraordinary circumstances accepted. What effort did the Petitioner make to locate Achat? I'm sorry, could you repeat the question, Your Honor? What effort did the Petitioner make to locate him and to inform him that he had been ineffective? What is the record show on that? The Petitioner testified that after he had been contacted by immigration authorities, he went to Achat's office. The office was closed. His phone number was no longer functioning, and he had heard, although he was not entirely sure, that Achat had been apprehended by authorities. Well, that's all he did. Well, you could do a good deal more if you're trying to find somebody. You did not represent him at that point, I figure. Did you represent him then? I did not, Your Honor, no. Your firm did not. No, my firm did not. I would say it was a puny effort to find this man and inform him that he had been ineffective. Frankly, Your Honor, there is not an enormous amount of detail regarding that question in the record, but I do note that at the time neither the IJ nor government counsel asked any additional questions in order to elicit more specific details. Achat simply testified that he attempted to contact Achat. He was unable to do so. The office was closed. The phone number didn't work. And then they moved on to a different question. So the way that you're dodging the time bar is you're just saying that the findings on the credibility were problematic, and so by setting that aside, then your client's entitled to a presumption of credibility on this, and therefore we can't just decide it on the time bar? Yes, Your Honor. That's correct. I don't see that Kumar has anything. Where does Kumar have anything to do with this? The Kumar v. Gonzales case? Again, it addresses the Lozado problem, but it doesn't address the credibility question, how you get from the – there doesn't seem to be a credibility issue from what I can see in that case about the 1-year bar. There was a Lozado problem about the 1-year bar. In that case, there was an adverse credibility determination that was reversed by this Court. Right. But did it ever – I believe you're correct. They did not specifically say – It had to do with the 1-year bar. So I – do you have any case which – where this is the way you did – the way you're proposing, that is, to look at the 1-year bar question as kind of after the fact instead of before the fact with regard to the credibility question? I think, frankly, Your Honor, the strongest support for that proposition is the Tamang case itself. They found jurisdiction and addressed the merits and addressed the petitioner's testimony as to what services were provided by counsel when he met, et cetera, notwithstanding the fact that they had reversed a separate adverse – or, excuse me, affirmed a separate adverse credibility finding here. But, again, it does not address the precise question that you're referring to. We've been deflecting you from what you wanted to do, and so I'll give you a couple minutes to talk about the adverse credibility finding on the merits. Of course. Thank you, Your Honor. What I'd like to do is just raise two brief points in addition to what was discussed in the brief with respect to the adverse credibility finding. And the first thing I'd like to do is just discuss the translation difficulties that took place in this case. It's not just translation difficulties. It's transcription difficulties. The transcripts, I mean, there are bizarre readings of words, and everybody looks like they're speaking Pig Latin even when they're speaking – even when there's no translation involved. I don't know what we do with it, but it's incoherent for us. I agree, Your Honor. And this Court addressed a very similar situation in the He v. Ashcroft case and specifically said at some point in the – at some points in the transcript, it was almost like a who's on first episode, where the testimony and the questions just didn't seem to match up, and I think that's very similar to what happens here when you try to read through this record. Was there an objection over the translation at the BIA? In an earlier hearing, not in the merits hearing, in an earlier hearing, Petitioner's counsel was a different attorney at that point, specifically requested that an Eastern Armenian translator be provided. At the IJ hearing, an Armenian translator, not an Eastern Armenian translator, was provided, but there was no objection in the IJ merits hearing. And I would like to point out, just with respect to how serious the communication difficulties were, at AR-122, and this is in the discussion of Ashcroft's ineffective assistance of counsel, as testified to by Mr. Markoian, the government counsel asked, Well then, why didn't you ever complain to the State Bar of California that this person who is claiming to be an attorney helped you? That this person claiming to be an attorney made these mistakes on your case? Why didn't you write any type of written complaint? And his answer is, when I knew it was wrong, when my indiscernible, he said, he says that, he said there are a lot of people, and it's in turn, there are many people. I sent yours early on. Another question, and you don't have any receipt or any proof of when it was sent, correct? And at this point, the judge explicitly admonishes Mr. Markoian, wait, wait, wait, sir, hold it. You need to wait until the question has been fully translated and discernible for the interpreter. And at this point, and in other parts of the testimony, Mr. Markoian actually attempts to listen in English and respond, and in some cases, respond directly in his own broken English, rather than go through the interpreter who speaks Armenian, not Eastern Armenian. And it happens here in a critical part of the testimony and other places as well. One final point I'd like to make, Your Honors, is with respect to the asylum application in this case. The I.J. repeatedly faulted Mr. Markoian for not including sufficient detail in the application itself. Well, let me tell you what my real problem is on the credibility question, and that is the whole set of dialogue about the hospital, I mean, not which hospital, but he kept, all of a sudden there were more and more hospitals coming up in the same year and more and more meetings, and it seemed like he was just, you know, making it up as he went along. Well, and it also seemed kind of odd that he left because he was persecuted of one religion and then he doesn't even join that church when he gets here. Which questions, Your Honor? Well, those are just. I actually have a third because I know a little bit of Russian, and I looked at this letter that is, this document that is translated as saying Republic of Armenia, and he's been receiving medical. To me, the translation bears no resemblance to what's on the piece of paper, and in particular the piece of paper says it's from the Armenian SSR, i.e., meaning it was from the Soviet period and not the Republic of Armenia, so I don't know what that's about. Frankly, Your Honor, I will not be able to respond to that question. I do not speak Russian. I will note, however, the IJ and the BIA certainly did not address that and it was not one of the bases for the adverse credibility finding. With respect, first, to Judge Bergeon's question, to the additional visits to the hospital, I'd like to point out very quickly that generally speaking, on that point and others, the testimony and the declaration were very consistent. In the application, for example, Mr. Martorian stated at AR-176, we Pentecostals have been persecuted many times by governmental authorities. At AR-177, he then goes on to describe in very high-level detail the two primary instances of persecution. There was a beating in a 10-day hospital stay and he was thrown in jail for four days. Again, in his testimony, he describes those two instances in a large amount of detail. And in the later testimony, when he was specifically asked whether there were additional instances of violence, at AR-129, he says, I was beaten, yes, there were indiscernible instances a few times. And the government follows up on this and at AR-131, Mr. Martorian clarifies and states that he had already described the, quote, two major injuries that he had sustained. At AR-137, again, he says, whenever they, referring to the military, saw us, they would harass us and beat us. Now, consistent with his declaration in the testimony that he suffered many instances of persecution, but only two major instances of persecution, he then testified that he had been beaten and had to go to the hospital on at least two other occasions. And that's, as Gerardo pointed out, at AR-135 to 37. And I'd like to point out, during the hearing itself, government counsel referred to this as an omission, not an inconsistency in the testimony. And, in fact, in the IJ's decision, she treated this as an omission rather than a direct inconsistency in the testimony. I think you should wrap up. Because you're almost double. Yeah. Okay. Would you like me to answer the question that you had? Okay. Thank you, Your Honor. Thank you very much. Ms. Bart Kiley-Keene, on behalf of the attorney general. I thought I would go in reverse order, if this is okay, for what Mr. Jackson has done, and talk about the adverse credibility determination first. Specifically, I want to first address the translation issues, because – Let me ask you a question. Do you think it's correct that if the adverse credibility finding based on the merits cannot be supported by substantial evidence, that that carries over to the one-year issue and that his determination – even besides the Lozado questions, his determination that he didn't believe that the whole Ashrod thing ever happened falls as well? No. I think they're two separate determinations, and the immigration judge's decision lays them out as two separate determinations. I'm sorry? They're two separate adverse credibility determinations. An immigration judge's decision first addresses the time bar and finds Mr. Marchand adversely credible with respect to his testimony regarding whether his application was timely. And that's one determination independent and separate from the adverse credibility determination made regarding the merits of his asylum claim regarding persecution in Armenia. So if you're correct on that, then we don't have to do any more, right? I think that's right, yes. What about all this translation problem, though? Yes, I do want to address that, because – I mean, that's probably at the heart of what concerns me more in terms of if – you know, I think that there are inconsistencies in the record. There are all of those things. But if someone's not really understanding, how do you really know what's what? Well, my response to that is that the record is not as clear as Mr. Martoyan seems to think it is regarding the fact that the interpreter and the petitioner, while he's testifying, don't understand each other. I think that's an assumption made in the opening brief that is not apparent on the record. What's apparent on the record is that Mr. Martoyan speaks some English, and the immigration judge will ask him a question. Because he speaks some English, he understands what the question is, and he starts to respond while the interpreter is translating. And so what happens is they don't hear each other. The translator over and over says, I can't hear you. Can you repeat it? Can you break it up? He actually says on the record one time specifically, the two of you are talking at once. And so while the immigration judge is telling Mr. Martoyan over and over, and I can point the Court to these instances, that he needs to wait for the translation to happen before he responds, whether he's responding in English or Armenian, it doesn't matter. And the reason for that is that two people are talking at once. There is no evidence on this record, and I would challenge a second look at this, to say that this particular interpreter and Mr. Martoyan don't understand each other. And if that were true, I would agree that we've got a serious issue. But nowhere does Mr. Martoyan say, I don't understand what you're saying, interpreter, and nowhere does the interpreter say, I don't understand what he's saying, or I don't understand the dialect. Nowhere does that appear on the record. Furthermore, I think you see it's pretty mixed up. And here we're deciding the fate of a family. Why not send it back and have them do it right? Because the immigration judge actually did do it right here. When there were issues, when the interpreter says. We've got this gobbled stuff. You can't deny that. It's gobbled. I do deny that, Your Honor, because the immigration judge in this case actually does a very good job of when there's an interpretation issue, she says, we need to repeat the question and have Mr. Martoyan answer the question. The question was not understood, so let's have the question be repeated. So there is a lot of gobbling, as Your Honor says. Let me go on to this I.J. who was really amazingly skeptical. At one point, she says, well, perhaps this was made up. I mean, how does an I.J. come up with a finding, well, perhaps this was made up? Because the immigration judge. Is that a fair reading? It is a fair reading. She does say that several times in her decision. But there are places where she just makes them say that in no place. He must have paid them to say this. That's right. He must have paid them. Now I've got to say everyone's talking at once. I've got to make the same call here. Go ahead. Yes. You want me to repeat your question? She said they must have paid them. I have to be candid, Your Honors. There are times when the immigration judge says, I just don't believe this person. Yes. She says it in her decision, and she says it during the hearing. It's one thing to say, I just don't believe it. It's another thing to say, out of the blue, that I paid him, somebody paid them to say this. There's no support for that. Well, respectfully, Your Honor, you have to remember that this is all happening during the course of the hearing. I mean, the immigration judge is observing Mr. Martwain's demeanor when he's being evasive in his response. Yes, but how does that give her the right to speculate that he's paid off a couple of witnesses? Well, from a legal standpoint, I agree that it does not give her the right to say that. Well, we're trying to apply the law, and we're looking at an I.J. who seems to inject a good deal of prejudice. Well, I would disagree with the characterization that it's prejudice. I think she's expressing what she's seeing before her, which is non-evasive answers to questions. Well, what did she see? Did she see him hand some money to somebody? Well, no, Your Honor. She's observing the demeanor of the respondent while he's testifying. And how does that lead to the speculation that he paid him off? Because she sees him providing evidence that's contradictory to what he's testifying to, and she sees him backtracking when given the opportunity to explain. And she's thinking in her head, this just doesn't make sense. And so, yes, she does go off the cuff and say, it seems to me that this evidence is fabricated and that he's paid these witnesses to write this letter today. That's all in her imagination, isn't it?  It is, Your Honor. And that particular aspect of this decision cannot be supported by the record. I completely agree. I can see that. But it certainly gives us a sense of the competence and fairness of this judge. Well, but when looking at whether substantial evidence supports the record, her other reasons for providing an adverse credibility determination are wholly supported by the record. There are actual inconsistencies on this record. Well, frankly, on the merits, the only one that seemed to me to really stand up was the hospital stuff. The rest, I mean, things like he said that he was attacked by unknown people, and then he testified that they were military people, but he still didn't know who they were, so what's inconsistent about it? He said he didn't know who they were, and he maintained he didn't know who they were. So why is that inconsistent? Well, I think what the immigration judge is really getting at here, and I think this is what I was trying to present in the briefs, too, is that a lot of times, and this Court has held, that omissions from the application are not held against a petitioner when he's testifying more specifically at the hearing. And, you know, that's a common-sense rule that this Court has made. The trouble is that Mr. Marchwine's asylum application does not present a claim for asylum. Unknown persons beating you outside of a bus stop does not qualify you statutorily for asylum in this country. So what I find most disturbing, and I think this is what the immigration judge is getting at, is that his claim has now been embellished such that it makes him statutorily eligible. He needs them to be from the military in order to get asylum in this country. Therefore, it is an important omission from his asylum application that he said that he didn't even know who they were. Is there a discrepancy with the application and the number of beatings? Well, yes. I think you're referring to when he's adding additional incidents of harm during the hospitalization. And to refresh Your Honor's memory about the transcript, this all comes in the context of the name of the hospital he stayed at, because his documentary evidence says one thing and his testimony is another. And so DHS counsel is asking him to explain why is there a discrepancy, and instead of, you know, explaining why he submitted this one letter that he ended up receiving from Armenia, he starts adding incidents of harm. And I think that's what the immigration judge finds troubling. And Judge Noonan, I think this goes to your question, too. It shows the immigration judge's frustration that Mr. Martorian won't just answer the question. Instead, it just seems like he's just making things up, as she says. He just his testimony is completely nonsensical, and it's not a translation issue. Again, there's nowhere on this record to show that this particular interpreter was not an Eastern Armenian interpreter. I'm not quite sure where Petitioner finds support for that in the record. And there was no objection to the interpreter and nowhere did the interpreter and the Petitioner say they don't understand each other. You've got an issue of people talking at once. Do you want to address the time-lost question briefly? Yes, Your Honor. And I do want to address the Timlong case that you've asked the attorneys to look at. And I think it's on point. I think that it would be somewhat futile for me to continue to argue that the court would lack jurisdiction over this. The only saving grace would be the overarching adverse credibility determination. But it appears that in the Timlong case, there was also an adverse credibility determination. There's not a lot made of it. But in the facts, it does say that the immigration judge disbelieved the testimony regarding whether the non-attorney had advised this particular individual not to file for asylum because he had not been harmed individually. So it actually appears that the Timlong case is virtually identical to this case in that the immigration judge made a separate adverse credibility finding with regard to the testimony about the timeliness of the application. And that's what we have here today. So therefore, the approach that the Petitioner is taking is consistent with Timlong. Yes. So therefore, the approach of beginning with the merits adverse credibility determination and then carrying it over to the one-year determination essentially is what to make sanctions. Yeah, I think so. That's not the argument, obviously, I raised in my brief. But I don't see that there's a way to distinguish this case based on the facts recited. I guess, though, what I'm finding is that you said in the beginning that we could decide the bar separate from the other adverse credibility. But now I'm hearing you say. Oh, no. That is what I'm saying. I'm sorry if I've confused. You have confused. Okay, I'm sorry. And me too. What I am saying is that there are two separate adverse credibility determinations. You're saying that Tamang didn't do it that way. I'm sorry? I thought you just said that Tamang did not do it that way. Well, the way that I read the facts recited in Tamang is that in that case, the immigration judge made an adverse credibility determination with regard to the timeliness issue. And I think that's what we have here too. Separate and apart from the merits. And what is the basis for the adverse credibility determination on the timeliness? The basis is, well, I think partially demeanor and partially a lack of corroboration. I mean, the immigration judge looks at Mr. Merkowitz. What was his demeanor? Well, I think you can see apparent on the record it's non-responsiveness to questions and confusing testimony, which I do not agree with. On the timeliness? Right. Throughout. Throughout. Because the immigration judge actually says that there's no evidence at all, zero, that this person even exists, much less that he helped Mr. Martoyan with his asylum application. What we have is Mr. Martoyan's confusing testimony regarding that he had signed the application in 1999 but that it had not been filed for seven more years, excuse me, seven more months after that. And the immigration judge just doesn't believe the testimony. And she says, well, it must have been backdated. But how does she know that? She doesn't. You're right. This is another instance where she is saying things based on what she's observed in Mr. Martoyan's testimony. Boy, you could get them all out of his face. Well, and his non-responsiveness and his evasiveness and his contradictory evidence that he submitted in support of his own application. You know, it's not just she's looking at his face. It's other things that do go to support a demeanor finding. If there are no more questions, Your Honor, I'll rest. Thank you. Thank you very much. Thank you, counsel. And thank you both for a useful argument in a difficult case. The case of Martoyan v. Holder will be submitted and will go on to Lucas v. Kennedy.
judges: Noonan, Berzon, Callahan